UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH & McLENNAN AGENCY LLC,<br><br>               Plaintiff,<br><br>       v.<br><br>ALLIANT INSURANCE SERVICES, INC. and<br>KATHLEEN JOHNSON,<br><br>             Defendants. | Case No.:<br><br><br>**COMPLAINT** |

Plaintiff Marsh & McLennan Agency LLC ("MMA" or "Plaintiff"), by and through its attorneys, Epstein Becker & Green P.C., as and for its Complaint against Alliant Insurance Services, Inc. ("Alliant") and Kathleen Johnson ("Johnson") hereby alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action arises from Alliant's latest execution of its raiding playbook—one that courts across the country have repeatedly exposed and enjoined. In 2025, Alliant decided to create a yacht-insurance practice within its Private Client division. Rather than invest the time, expertise, and resources necessary to build such a practice lawfully, Alliant chose the shortcut that has triggered more than seventy lawsuits in the last decade: it targeted a competitor's practice, its confidential information, and a key employee who could deliver those client relationships to Alliant.

2.      Alliant set its sights on MMA's nationally recognized yacht-insurance group and Johnson. After twenty years at MMA, Johnson was one of the most senior yacht specialists in the industry, entrusted with some of the highest-value yacht clients in the country and, following her July 2024 promotion, granted full visibility into every client, every renewal, every revenue stream,

and every confidential document on MMA's yacht platform. Alliant recruited Johnson for her access to the clients and confidential information that MMA had spent decades developing.

3.      While still employed at MMA—and still cloaked in MMA's trust—Johnson secretly coordinated with Alliant, concealed her acceptance of Alliant's offer, funneled communications through her personal Gmail account, provided Alliant with confidential information about MMA's clients and employees, and helped Alliant identify the personnel she believed essential to transferring MMA's book of business. She then surreptitiously removed confidential MMA client documents, including a detailed underwriting application for a current MMA yacht client, which she later transmitted from her new Alliant email account to Alliant's only other yacht-practice employee – another strategic recruit she had identified from MMA, Bryan Kunnemann.

4.      Johnson resigned from MMA effective August 27, 2025, giving Alliant the hire it needed to launch its newly created yacht practice. Three weeks later, at Alliant's and Johnson's direction, Kunnemann, followed from MMA. With only Johnson and Kunnemann in place—and no prior yacht-insurance capabilities—Alliant began promoting that it could "handle the biggest yachts **now**" and soon began converting MMA clients. Within weeks, multiple long-standing MMA yacht clients for whom Johnson had been responsible submitted broker-of-record letters naming Alliant as their new broker.

5.      Johnson's and Kunnemann's departures were the predictable product of Alliant's raiding strategy: identify the competitor's most valuable producer; model the revenue that the producer's client relationships can generate; recruit the key employees necessary to service those clients; secure the competitor's confidential information on the way out; and then divert the business before the competitor can obtain relief. This lawsuit seeks to hold Alliant and Johnson

accountable for the contractual breaches, fiduciary breaches, and unlawful interference by which they attempted to misappropriate MMA's yacht-insurance practice for Alliant's benefit.

## THE PARTIES

6.      MMA is an insurance brokerage and risk management firm that provides risk management, insurance, and employee benefit support services to its clients. MMA operates brokerage offices and businesses across the United States. MMA is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in White Plains, New York. MMA is an indirect subsidiary of Marsh & McLennan Companies, Inc., a publicly held corporation traded on the New York Stock Exchange, which is incorporated in Delaware with its principal place of business in New York, New York.

7.      Johnson is an individual who, upon information and belief, is a citizen and resident of the State of North Carolina. Johnson is a former employee of MMA and a current employee of Alliant.

8.      Alliant is a corporation organized and existing under California law, with its principal place of business in Newport Beach, California.[1] Alliant does business and maintains offices throughout the United States, including in New York, where it is registered to do business, has appointed an agent for service of process, and maintains six offices (including two offices located in New York City). Like MMA, Alliant is in the business of providing insurance brokerage, risk management and employee benefit support services. MMA and Alliant are direct competitors.

---

[1] Until January 2020, Alliant was a Delaware corporation. But after a privilege waiver in a litigation against Alliant in Delaware laid bare the full depth of Alliant's unlawful conduct and resulted in a scathing rebuke by the Delaware Chancery Court, Alliant fled the jurisdiction, dissolving its incorporation in Delaware and re-incorporating in California.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.     This Court also has subject matter jurisdiction over MMA's claims under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction) because the Complaint alleges a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq*., and MMA's other claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Personal jurisdiction exists over Johnson because in the agreement that she executed with MMA, detailed below, she agreed to the jurisdiction of this Court in connection with any action arising in connection with those agreements or with her employment with MMA. Johnson's breaches of her obligations under that agreement and her breaches of the duty of loyalty during her employment with MMA are the subject of this Complaint.

12.     This Court has personal jurisdiction over Alliant because Alliant conducts business in this District and has committed tortious acts within the State of New York or has directed its tortious conduct toward the State of New York. Alliant knowingly targeted and recruited employees of MMA, which is headquartered in New York, induced them to breach agreements that Alliant knew were governed by New York law and contained New York forum selection clauses, and caused harm to MMA in New York. Alliant's conduct was intentionally directed at this forum, and the claims arise directly from that conduct.

13.     Alliant is also subject to personal jurisdiction in this Court under the closely related

parties doctrine because Alliant intentionally interfered with contracts between MMA and its employees, which Alliant knew contained mandatory forum selection clauses designating the courts in New York County or the Southern District of New York as the exclusive forum for resolution of disputes. Alliant's interference with those contracts is the precise conduct giving rise to this action. Because Alliant orchestrated, directed, and benefited from the breaches it induced of contracts it knew contained New York forum selection clauses, it was foreseeable that it would be bound by those forum selection clauses.

14.     Venue is proper in this District pursuant to 28 USC §§ 1391(b)(2) and 1391(b)(3) because the agreement signed by Johnson with MMA, which is the subject of the breach of contract claims set forth herein, contains a Governing Law and Choice of Forum provision, designating courts in New York County or the United States District Court for the Southern District of New York as the exclusive venue for resolution of disputes between the parties. Further, MMA maintains its principal place of business in this judicial District.

## FACTUAL ALLEGATIONS

### A.     MMA's Market Leading Yacht Practice

15.     MMA is an insurance brokerage and risk management firm that provides risk management, insurance, and employee benefit support services to its clients. These services include providing advice on insurance needs, negotiating terms and conditions of insurance policies on behalf of clients, and providing employee benefit support and advice.

16.     MMA maintains one of the leading yacht-insurance specialty practices in the United States, housed within its Private Client Services National ("PCSN") division. Originally part of Marsh, Inc. ("Marsh"), the PCSN yacht practice focuses on large, high-value private vessels, including mega-yachts requiring complex international navigation coverage, bespoke

underwriting solutions, and coordinated placements across multiple global markets. The practice provides comprehensive risk management services for these vessels and related marine assets, including hull and machinery coverage, protection-and-indemnity liability, pollution liability, and specialized ancillary coverages such as cyber superyacht protection and kidnap-and-ransom options.

17.    The complexity of these vessels demands a correspondingly high level of technical expertise. PCSN yacht professionals evaluate vessel construction and classification, navigational warranties, crewing and operational requirements, and associated risk profiles; review underwriters' safety, hot-work, and shipyard protocols; assess pollution-liability exposures; and manage intricate claim scenarios arising in international waters. That technical depth enables PCSN to advise on, structure, and steward some of the most sophisticated yacht-insurance programs in the industry.

18.    Securing optimal terms for such vessels also requires navigating a global insurance marketplace. PCSN yacht specialists work directly with virtually every major insurer and intermediary specializing in large yachts in the U.S., London/Lloyd's, and European markets; compare terms and conditions across jurisdictions; negotiate premium structures; and coordinate coverages to ensure seamless integration between clients' yacht policies and their broader personal-lines insurance programs. Their ability to synthesize global market offerings and tailor placements for the world's largest private yachts is a key distinguishing feature of the practice.

19.    Through decades of superior service and sustained investment—first by Marsh and later by MMA—the PCSN yacht practice has developed a client portfolio comprised of owners of some of the largest and most technically sophisticated private yachts in the world. Vessels in this portfolio often exceed 50 meters, feature complex international-navigation profiles, and involve

bespoke operational and crewing requirements. The expertise, infrastructure, and long-standing relationships PCSN has built with yacht underwriters, specialized wholesale brokers, marine surveyors, shipyards, and pollution-response resources reflect a level of experience, expertise and infrastructure that competitors cannot easily replicate.

### B.    Johnson's Employment with MMA

20.    Johnson joined Marsh in 2003 in the yacht practice. By leveraging Marsh's brand, resources, and the platform it spent decades building, she developed the technical expertise required to service the practice's most complex vessels and earned the trust of their owners and captains alike. Over the next two decades, she rose steadily through the organization, ultimately becoming one of PCSN's most senior yacht specialists, responsible for some of the practice's highest-value yacht clients and culminating in her promotion to Yacht Specialty Manager for the PCSN division in July 2024.

21.    To perform her job advising yacht clients, placing coverage, and delivering the sophisticated, customized service that PCSN's high-value yacht clients require, MMA necessarily entrusted Johnson with extensive confidential and proprietary information, including, without limitation: the identity and direct contact information of yacht owners, captains, fleet managers, family-office representatives, and other key decisionmakers; clients' risk-tolerance profiles, navigation plans, crew structures, safety protocols, and operational preferences; complete details concerning clients' existing yacht-insurance programs, including hull and machinery values, protection-and-indemnity limits, pollution-liability needs, and specialized ancillary coverages; renewal dates, pricing structures, negotiated terms, and underwriting considerations for each account; clients' loss history, survey reports, classification documentation, and maintenance records; strategic information regarding prior negotiations with yacht underwriters in the U.S.,

London/Lloyd's, and European markets; MMA's assessments of individual underwriters' appetites and requirements; MMA's compensation structure for each client relationship; the revenue associated with those accounts; and MMA's internal evaluations of client-retention risks or vulnerabilities.

22.    This information is the product of decades of investment by MMA—gathered, refined, and continually updated through substantial time, effort, and expense. It has independent economic value, is not available to the public or to competitors, and would be highly valuable to any firm seeking to solicit MMA's yacht clients, replicate MMA's specialty-practice capabilities, or accelerate the launch of a competing yacht practice without making the investments over years MMA has made.

23.    Because of the value and sensitivity of this information, MMA treats it as strictly confidential and takes extensive measures to safeguard it. These measures include limiting access to employees with a specific business need to know; educating those employees on their confidentiality obligations; restricting access to internal systems, databases, and underwriting files; and requiring employees to sign written agreements prohibiting the misuse, improper disclosure, or post-employment retention of such information.

24.    Consistent with these confidentiality safeguards, Johnson executed MMA's Non-solicitation and Confidentiality Agreement (the "NSA") when she commenced employment with MMA. (A true and correct copy of Johnson's executed NSA is attached hereto as **Exhibit A**.)

25.    The NSA includes a two-year post-employment client non-solicitation and non-servicing covenant. Specifically, in Section 1 of the NSA, titled "Non-Solicitation of Clients," Johnson agreed that for two years following her separation of employment from MMA, she would not, directly or indirectly:

(i) solicit clients or prospective clients of [MMA] for the purpose of selling or providing consulting services or projects, or selling products, of the type sold or provided by Employee while employed by [MMA]; (ii) induce clients or prospective clients of [MMA] to terminate, cancel, not renew, or not place business with [MMA], (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by [MMA] on behalf of any clients or prospective clients of [MMA], or (iv) assist others to do the acts specified in Sections 1(b)(i)-(iii). … Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

26.     The NSA also includes a two-year post-employment employee non-solicitation covenant. Specifically, in Section 2 of the NSA, titled "Non-Solicitation of Employees," Johnson agreed that "both during employment with MMA and for a period of two (2) years thereafter," she would not, "directly or indirectly," whether on her

own account or on behalf of any person, company, corporation, or other entity, … solicit, or endeavor to cause any employee of [MMA] with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to leave employment with [MMA].

27.     In Section 5 of the NSA, titled "Nondisclosure of Confidential Information and Trade Secrets," Johnson "acknowledge[d] and agree[d] that [MMA] is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled, and acquired by [MMA] at its great effort and expense," and that "disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in

connection with [MMA's] business…, will be highly detrimental to [MMA] and cause it to suffer serious loss of business and pecuniary damage."

28.      Accordingly, in Section 5 of the NSA, Johnson agreed that during her employment with MMA and at any time thereafter, she would not, "directly or indirectly, disseminate or disclose to any other person, organization or entity Confidential Information and Trade Secrets," except to the extent required to carry out her duties as an MMA employee.

29.      In Section 9 of the NSA, Johnson agreed that the restrictions contained in the NSA were "necessary to protect the legitimate business interests of [MMA] and [were] reasonable in view of the benefits and consideration Employee has received or will receive from [MMA]." Johnson also expressly acknowledged that the restrictions would not prevent her "from obtaining gainful employment in [their] field of expertise or cause [them] undue hardship."

30.      Johnson also agreed in Section 10 of the NSA that MMA would be entitled to recover its attorneys' fees and other costs "incurred by [it] in investigating or seeking to enforce the provisions of th[e] [NSA]."

31.      Section 15 of the NSA provides that it shall be governed by New York law, and that "any action or proceeding with respect to the [NSA] and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York." Johnson consented to "personal jurisdiction" and "irrevocably waive[d] any objection…to the laying of venue of any such action in the said court(s)" or that "any such action brought in said court(s) has been brought in an inconvenient forum."

### D.    Alliant's Unlawful Growth Strategy and Playbook

32.    For nearly a decade, Alliant has grown its business by weaponizing competitors' employees to capture competitors' client relationships for Alliant. Alliant's growth strategy is to entice producers overseeing substantial books of business at competing firms to join Alliant on the condition that they bring their former employer's clients and client service personnel with them— in deliberate breach of their common law duties and restrictive covenant obligations to their former employer. Alliant euphemistically refers to these targeted hires as "leveraged hires."[2]

33.    This tactic is knowingly unlawful, calculated on the assumption that the financial return on the pilfered client relationships will exceed any legal costs Alliant may incur. Alliant's President has made the calculus clear: when lawsuits arise, the company simply "strike[s] a deal with the competitor that involves buying the producer's book of business for less than full market value."[3] This way, Alliant secures long-term client relationships at a discount—keeping exactly what it values most, while skirting fair market principles (and the law) in the process.

34.    Over the past decade, Alliant's inherently unlawful growth model has triggered more than 70 lawsuits against the company and the producers it has poached—each case involving the same unlawful tactics at issue here. Through this wave of litigation, courts and competitors have repeatedly unmasked Alliant's strategy: a calculated, repeatable method for stealing business

---

[2] *See Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, Exhibit 1 to Transmittal Affidavit and Corrected Transmittal Affidavit of Jarrett W. Horowitz in Support of Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. July 21, 2022) (internal Alliant email referring to producers with existing books of business whom Alliant was recruiting from a competitor firm as "Leveraged Hires"); Declaration of Ned Sander in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, *Armfield Harrison & Thomas, LLC and BRP Colleague Inc. v. Brian King and Alliant Ins. Servs., Inc.*, No. 23-cv-00666, ECF No. 25 at ¶ 18 (W.D. Wash. Sept. 14, 2023).

[3] Declaration of Ned Sander in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, *Armfield Harrison & Thomas, LLC and BRP Colleague Inc. v. Brian King and Alliant Ins. Servs., Inc.*, No. 23-cv-00666, ECF No. 25 at ¶ 19 (W.D. Wash. Sept. 14, 2023).

"mask[ed]…under a façade of compliance measures" intended to deceive competitors and the courts and thereby minimize Alliant's legal risk. *Lockton*, 2019 WL 2536104, at *22.[4] The pattern has become so familiar, it has become known in courts across the country as the Alliant "playbook." Raid after raid, the pattern repeats—predictable in its design, with only minor variations in execution.

35.     First, Alliant identifies a producer at a competitor who is perceived to be important to client relationships. In initial discussions with the producer, Alliant investigates the size of the book of business that the producer controls for the competitor. Alliant then offers the producer an inflated compensation package—including a cash sign-on bonus and equity in the company—to join Alliant based on the book of business that the producer manages for the competitor. These inflated compensation packages are expressly contingent on the producer violating his or her contractual obligations and other duties to his or her employer by poaching clients, soliciting colleagues to join Alliant, and participating in the other aspects of Alliant's schemes as described herein. Alliant understands that this "leveraged hire strategy" depends upon the violation of fiduciary and contractual obligations owed by employees to Alliant's competitors. Alliant not only encourages and induces these employees to breach their duties, but also it assumes responsibility for those breaches by agreeing to indemnify the producers against any claims that might arise from the execution of this unlawful strategy.

36.     Second, at Alliant's direction, the producer agrees to withhold from his or her current employer notice of his or her decision to join Alliant. While still employed by a competitor,

---

[4] In 2022, in unsealing the internal Alliant documents that had been revealed in discovery in the *Lockton* litigation, the Delaware Chancery Court noted that "Alliant faces at least forty-one lawsuits in at least twenty-five jurisdictions in which competitors have asserted similar claims" related to Alliant's strategy, and documents revealed in that litigation "provide insight into Alliant's *modus operandi.*" *Mt. West Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*, C.A. No. 2019-0226-JTL, Order Denying in Part and Granting in Part Second Motion for Continued Confidential Treatment, ¶ 20(a) (Del. Ch. July 14, 2022).

the producer operates under the materially false pretense that he or she remains a loyal employee of the competitor, when in fact the producer is acting in Alliant's interests. During this time, the producer assists Alliant's recruitment of other employees of the competitor, including key client service personnel, in violation of the employees' common law and contractual obligations and duties. Because the producer continues to appear loyal, he or she also retains ongoing access to the competitor's confidential, proprietary, and trade-secret information, and uses that access to gather client-specific underwriting materials, renewal data, employee information, and other sensitive documents for Alliant's benefit—information Alliant and the producer intend to use to solicit those clients and to service them upon the producer's arrival at Alliant.

37.    Third, once Alliant and its recruits have completed their behind-the-scenes groundwork, Alliant coordinates the timing and sequencing of their departures and the eventual transfer of client relationships to maximize the damage to the competitor and the benefits of the raid for Alliant. Alliant seeks to engineer a head start by ensuring that, long before any client paperwork is submitted or any formal transition occurs, Alliant and the departing employees have mapped targeted accounts, reviewed renewal cycles, aligned staffing needs, and positioned Alliant to absorb the business. Only after this preparation is complete does Alliant schedule the resignations of its new recruits—with the movement of clients and additional employees to follow once Alliant determines that the conditions are most advantageous for the transition. Alliant deliberately structures this sequence so that by the time competitors discover the scope of the raid or can seek injunctive relief, Alliant has already laid the critical foundation for diverting the business. Through this calculated interplay of advance preparation, coordinated timing, and phased client pursuit, Alliant ensures that it ultimately secures the clients, confidential information, and

revenue it seeks—knowing that by the time legal consequences arise, the damage will already have been done.

38.     The litigations against Alliant for its unlawful raiding strategy include at least the following: *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc., Andrew Oldenburg, Elizabeth McKinney, Kimberly Moore, and Danielle Black*, No. 25-cv-06936 (S.D.N.Y. Aug. 21, 2025); *Acrisure of California v. Alliant Ins. Servs., Inc.*, 25-cv-00702 (W.D. Mich. June 25, 2025); *Marsh USA LLC v. Alliant Ins. Servs., Inc., Glenn Pelletiere, and Colin Horgan*, No. 25-cv-05470 (S.D.N.Y. July 1, 2025); *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Travis Davis, Keegan Richardson, Raiza Robles, and Amanda* Gunn, No. 25-cv-01260 (S.D.N.Y. Feb. 12, 2025); *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc., Johnny Osborne, Margaux Stone, and Rachel Murray*, No. 24-cv-00914 (S.D.N.Y. Dec. 23, 2024); *Willis Towers Watson Midwest, Inc. v. Miller and Alliant Ins. Servs., Inc.*, No. 24-cv-02539 (D. Kan. Nov. 21, 2024); *Willis Towers Watson Northeast, Inc. v. Scott Davis, Erin Schwamb, and Alliant Ins. Servs., Inc.*, No. 24-cv-01816 (D. Conn. Nov. 19, 2024); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398 (W.D. Ky. July 5, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *NFP Corp. Servs. (SE), Inc. v. Starkey*, No. 24-cv-00796 (D. Del. June 25, 2024); *NFP Prop. & Cas. Servs., Inc. v. Alliant Ins. Servs., Inc.*, No. 24-cv-00789 (C.D. Cal. Apr. 10, 2024); *The Tex. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2024-11651 (Tex. Dist. Ct. Feb 23, 2024); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023 (N.Y. Sup. Ct. Nov. 14, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc*., No. 23-cv-659 (E.D. Va. Oct. 12, 2023); *Lockton Cos., LLC Pac. Series, and Lockton Partners, LLC v. Alliant Ins. Servs., Inc., Barnes, Racunas, and Roderick*, No. 23-cv-00705 (W.D. Mo. Oct. 3, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz,*

*Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751 (D.S.C. Sept. 22, 2023); *Woodruff-Sawyer*

*& Co. v. Pelissier, Alliant Ins. Servs., Inc., and Does 1-5*, No. 30-2023-01336213 (Cal. July 13,

2023); *Aon PLC v. Alliant Ins. Servs., Inc.*, 23-cv-03044 (N.D. Ill. May 15, 2023); *Armfield*

*Harrison & Thomas, LLP and BRP Colleague, Inc. v. King and Alliant Ins. Servs., Inc.*, No. 23-

cv-666 (W.D. Wash. May 8, 2023); *USI Ins. Servs. LLC v. Alliant Ins. Servs., Inc.*, No. 23-cv-

00192 (D. Ariz. Jan. 30, 2023); *Lockton Cos., LLC - Pac. Series v. Giblin*, No. 22-CV-00791 (W.D.

Mo. Nov. 30, 2022); *McGriff Ins. Servs., Inc.  v. Suplick, Fox, Cook, Gibson, and Alliant Ins.*

*Servs., Inc.*, No. 2022-CA-008660-O (Fla. Cir. Ct. Sept. 19, 2022) *Arthur J. Gallagher & Co. v.*

*Alliant Ins. Servs., Inc.*, 22-cv-03931 (N.D. Ill. July 28, 2022); *Willis Towers Watson Southeast,*

*Inc. v. Alliant Ins. Servs., Inc., Thomas, Bennett, and Gullet*, No. 22-cv-277 (W.D.N.C. June 21,

2022); *McGriff Ins. Inc. v. Madigan, Gramling, Linde, and Alliant Ins. Servs., Inc.*, No. 22-cv-

05080 (W.D. Ark. Apr. 26, 2022); *Aon PLC, Aon Group, Inc., Aon Corp., and Aon Risk Services*

*Companies, Inc. v. Alliant Ins. Servs., Inc., Johnson, Stites, Barlow, Doerfler, Kunstler, and Chan*,

No. 21-cv-06871 (N.D. Ill. Dec. 27, 2021); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc.,*

*Bixby, Hinckley, Leavitt, Pester, and Rogers*, No. 2184CV2828 (Mass. Dec. 10, 2021); *Willis*

*Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, 21-cv-00417 (W.D.N.C. Aug. 12, 2021);

*Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Andrew Rader, and Nicole Rioux*,

No. 202982-1 (Chan. Ct., Tenn., Aug. 3, 2021); *Aitken v. USI Ins. Servs., LLC*, No 21-cv-00267

(D. Or. Feb. 18, 2021); *Kibble & Prentice Holding Co. v. Anderson, and Alliant Ins. Servs., Inc.*,

No. 82-CV-21-619 (Minn. Dist. Ct. Feb. 19, 2021); *Kibble & Prentice Holding Co., v. Tilleman*

*and Alliant Ins. Servs., Inc.*, No. 21-cv-00083 (D. Idaho Feb. 18, 2021); *AssuredPartners*

*Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *The*

*Partners Grp., LTD v. Bonville and Alliant Ins. Servs., Inc.,* No. 20CV34115 (Or. Cir. Ct. Oct. 6,

2020); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc. and Stone Point Capital*, No. 2020-0780 (Del. Ch. Sept. 14, 2020); *Arthur J. Gallagher & Co. v. Pierce, Albrecht, Conway, Lambourne, Ruemke, Veltman, Burke, Thalachelloor, and Alliant Ins. Servs., Inc.*, No. 47103886-2020 (Tex. Dist. Ct. Aug. 13, 2020); *Arthur J. Gallagher & Co. v. Tarantino, Heater, Machette, Brush, and Alliant Ins. Servs., Inc.*, No. 20-cv-05505 (N.D. Cal.) (Aug. 7, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Gallagher Benefit Servs., Inc. v. Ghirardi and Alliant Ins. Servs., Inc.*, No. 50-2020-CA-004646-MB (Fl. Cir. Ct. Apr. 24, 2020); *Assured Partners of Washington, LLC v. Acarregui and Alliant Ins. Servs., Inc.*, No. 20-cv-00290 (W.D. Wash. Feb. 24, 2020); *Marsh USA Inc. v. Vaught, Snelgrove, Dowling, Shahidi, Lu, Turney, Nguyen, and Alliant Ins. Servs., Inc.*, No. 651024/2020 (N.Y. Sup. Ct. Feb. 14, 2020); *Aon Risk Servs. Co. v. Alliant Ins. Servs., Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312 (N.D. Ill. Nov. 5, 2019); *USI Ins. Servs. LLC and USI Advantage Corp. v. Banahan and Alliant Ins. Servs., Inc.*, No. 68183/2019 (N.Y. Sup. Ct. Nov. 1, 2019); *JLT Specialty Ins. Servs. Inc. v. Riccio, Walsh, Carroll, Decatur, Franzese, Leto, and Alliant Ins. Servs., Inc.*, No. 652659/2019 (N.Y. Sup. Ct. May 6, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs., Inc.*, 2019-0226-JTL (Del. Ch. Mar. 22, 2019); *Arthur J. Gallagher & Co. v. Kuntz and Alliant Ins. Servs., Inc.*, No. GD-19-02440 (Pa. C.P. Allegheny Cnty. Feb. 8, 2019); *NFP Corp. and Maschino, Hudelson & Associates, L.L.C. v. Ayala, Alliant Ins. Services, Inc. and C.L. Scott Corporate Ins. Services, Inc.*, 2018-0688 (Del. Ch. Sept. 18, 2018); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381 (D.N.J. Aug. 30, 2018); *Marsh USA, Inc. v. Moody, Young, Beacham, O'Connell, and Alliant Ins. Servs., Inc.*, No. 17-651325 (N.Y. Sup. Ct. Aug. 7, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 18-cv-1826 (M.D. Fla. July 25, 2018); *Willis Ins. Servs. of Ga. v. Alliant*

*Ins. Servs., Inc.*, No. 2018cv308132 (Ga. Super. Ct. July 23, 2018); *Willis of Minn. v. Alliant Ins. Servs., Inc.*, No. 27-cv-18-11684 (Minn. Dist. Ct. July 20, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520 (S.D.N.Y. Dec. 5, 2017); *USI Ins. Servs., LLC. v. Zukus and Alliant Ins. Servs., Inc.*, No. 2018-12953 (Pa. C.P. Montgomery Cnty. May 15, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *USI Ins. Servs. Nat., Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O (Fla. Cir. Ct. Nov. 3, 2017); *USI, Inc. v. Call v. Alliant Ins. Servs., Inc.*, No. BC678226 (Cal. Super. Ct. Oct. 2, 2017); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct. 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs., Inc.*, No. 2017-0540 (Del. Ch. July 26, 2017); *Ralph Weiner & Assocs., LLC v. Hancock*, No. 2017-CH-06618 (Ill. Cir. Ct. May 9, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No. 502016CA00904MB (Fla. Cir. Ct. April 10, 2017); *The Graham Co. v. Harper, Algeo, Alliant Ins. Servs., Inc.*, No. 170202712 (Pa. C.P. Philadelphia Cnty. Feb. 9, 2017); *Willis of Mass. v. Feinberg and Alliant Ins. Servs.*, No. 1684CV01497 (Mass. Super. Ct. Oct. 3, 2016); *The Hays Group, Inc. v. Peters and Alliant Ins. Servs., Inc.*, No. 0:16-cv-2352 (D. Minn. Oct. 12, 2016); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824 (Fla. Cir. Ct. Aug. 16, 2016); *Marsh USA Inc. and Marsh & McLennan Cos., Inc. v. Schuhriemen*, No. 16-cv-2998 (S.D.N.Y. Apr. 22, 2016); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924 (N.D. Ill. Feb. 2, 2016); *Smith Bros. Ins. LLC v. Ellenberg-Gray*, No. CV-15-6060903-S (Conn. Super. Ct. Dec. 7, 2015); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700 (N.Y. Sup. Ct. June 26, 2014); *Regions Ins., Inc. v. Alliant Ins. Servs., Inc.*, No. 13-cv-00667 (S.D. Miss. Oct. 25, 2013); *Anco Ins. Servs. of Hous. v. Barnard*,

No. 2011-29054 (Tex. Dist. Ct. May 13, 2011); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. 2011).

39.     Courts have enjoined Alliant's unlawful behavior or otherwise ruled against Alliant in at least the following matters: *Marsh & McLennan Agency LLC v. Alliant Ins. Servs., Inc., Johnny Osborne, Margaux Stone, and Rachel Murray*, No. 24-cv-00914, Op. and Order Granting in Part and Denying in Part Appl. for Prelim. Inj., ECF. No. 31 (S.D.N.Y. Jan. 27, 2025); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, TRO, ECF. No. 30 (W.D. Ky. July 12, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, Mem. and Op., ECF. No. 92 (W.D. Ky. Sept. 13, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, Consent Prelim. Inj. Order, ECF No. 93 (W.D. Ky. Sept. 13, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023, Order to Show Cause for TRO and Prelim. Inj., NYSCEF Doc. No. 36 (N.Y. Sup. Ct. Nov. 21, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc*., No. 23-cv-659, TRO, ECF. No. 46 (E.D. Va. Nov. 8, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Order, ECF No. 47 (D.S.C. Nov. 8, 2023) (temporary restraining order); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Prelim. Inj. Order, ECF. No. 63 (D.S.C. Dec. 28, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Permanent Inj. Order, ECF No. 63 (D.S.C. May 24, 2024); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Andrew Rader, and Nicole Rioux*, No. 202982-1, TRO

(Chan. Ct., Tenn., Aug. 3, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.,
Thomas, Bennett, and Gullet*, No. 22-cv-277, Prelim. Inj. Order, ECF No. 43 (W.D.N.C. July 7,
2022); *Kibble & Prentice Holding Co. v. Anderson and Alliant Ins. Servs., Inc.*, No. 82-CV-21-
619, Order Granting Pl.'s Mot. for Partial Summ. J. (Minn. Dist. Ct. Dec. 28, 2022); *Aitken v. USI
Ins. Servs., LLC*, No 21-cv-00267, Op. & Order, ECF. No. 19 (D. Or. Feb. 26, 2021) (granting
temporary restraining order); *Aitken v. USI Ins. Servs., LLC*, No 21-cv-00267, Op. & Order, ECF.
No. 19 (D. Or. May 28, 2021) (granting preliminary injunction); *Kibble & Prentice Holding Co.,v.
Tilleman and Alliant Ins. Servs., Inc*., No. 21-cv-00083, Mem. Dec. & Order, ECF No. 82 (D.
Idaho December 2, 2022) (granting in part plaintiff's motion for summary judgment);
*AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564, Order, ECF No.
30 (E.D.N.Y Nov. 24, 2020) (temporary restraining order); *AssuredPartners Northeast, LLC v.
Stone*, 20-cv-05564, Agreed Permanent Injunction and Order of Dismissal, ECF No. 35 (E.D.N.Y
December 21, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159,
Order, ECF No. 15 (W.D. Pa. Aug. 10, 2020) (temporary restraining order); *Huntington Bancshares
Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159, Mem. Op., ECF No 60 (W.D. Pa. Oct. 29,
2020) (granting preliminary injunction); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs.,
Inc.*, 20-cv-01159, Order, ECF No 61 (W.D. Pa. Oct. 29, 2020) (preliminary injunction); *Assured
Partners of Wash., LLC v. Acarregui, and Alliant Ins. Servs., Inc.*, No. 20-cv-00290, Temporary
Restraining Order, ECF No. 15 (W.D. Wash. Feb. 28, 2020); *Aon Risk Servs. Co. v. Alliant Ins.
Servs., Inc. Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312, Temporary
Restraining Order, ECF No. 31 (N.D. Ill. Nov. 25, 2019); *Aon Risk Servs. Co. v. Alliant Ins. Servs.,
Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312, Mem. Op. & Order,
ECF No. 32 (N.D. Ill. Nov. 25, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners,*

*LLC v. Alliant Ins. Servs., Inc.*, No. CV 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. June 20, 2019); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381, Order, ECF No. 14 (D.N.J. Sept. 5, 2018) (temporary restraining order); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381, Order, ECF No. 14 (D.N.J. Oct. 3, 2018) (preliminary injunction); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order, ECF No. 11 (S.D.N.Y. December 7, 2017) (temporary restraining order); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order to Show Cause for Temporary Restraining Order and Preliminary Injunction, ECF No. 12 (S.D.N.Y. December 7, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order Granting a Permanent Injunction, ECF No. 32 (S.D.N.Y. February 13, 2018); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O, Order Granting Temporary Injunction (Fla. Cir. Ct. Nov. 28, 2017); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O, Order on Plaintiff's Motion for Summary Judgment on Liability (Fla. Cir. Ct. Aug. 22, 2019); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct., Sept. 12, 2017); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824, Order Partially Granting Motion for Injunction, 2016 WL 8814184 (Fla. Cir. Ct. Aug. 21, 2016); *Marsh USA Inc. and Marsh & McLennan Cos., Inc. v. Robert Schuhriemen*, No. 16-cv-2998, Mem. Order, ECF. No 11 (S.D.N.Y. May 2, 2016) (granting preliminary injunction); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924, Order, ECF No. 26 (N.D. Ill. Feb. 5, 2016) (temporary restraining order); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 650700/2014, 2014 WL 2990393 (N.Y. Sup. Ct. June 26, 2014) (preliminary injunction); *Anco Ins. Servs. of Hous. v. Barnard*, No. 2011-29054 (Tex. Dist. Ct. May 13, 2011); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011

(N.Y. Sup. Ct. Sept. 28, 2011) (temporary restraining order); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 20, 2011) (preliminary injunction).

40.    Alliant undertakes its raids with full awareness that its conduct is unlawful and will result not only in litigation but in the payment of damages. Courts have already found that Alliant builds these expected losses into its business model from the outset. In *Aon Risk Services v. Cusack*, for example, the court found that Alliant projected hundreds of millions of dollars in revenue from a targeted raid while simultaneously reserving nearly $20 million for anticipated settlement payments and millions more for expected legal fees—reserves Alliant set *before* the producers even resigned. 34 Misc. 3d 1205(A), 946 N.Y.S.2d 65 (Sup. Ct. 2011). Alliant's own internal documents in that case showed that it modeled future revenue from the raided clients, identified the expected "Build Up Costs," and included within those costs the damages it expected to pay once litigation inevitably followed. In other words, Alliant treats the legal exposure created by its unlawful conduct—not as a risk to be avoided—but as a predictable, budgeted cost of executing its unlawful growth strategy.

### G.    Alliant Recruits Johnson, and With Her Help, Executes the Playbook on MMA—Again

41.    By 2025, Alliant had made a strategic decision to create a dedicated yacht-insurance practice within its Private Client division. Unlike its existing Marine Practice—which focuses on commercial maritime risks such as ports, terminals, cargo, shipyards, energy infrastructure, and industrial vessels—Alliant had no meaningful presence in the luxury-yacht market, no established yacht-insurance team, and no personnel with the technical expertise required to service high-value yacht clients or the client relationships that define that market. Establishing a true yacht practice would have required years of investment in talent, infrastructure, underwriting relationships, and

client development, including building trust with yacht owners, captains, fleet managers, and family offices. Alliant chose a different path.

42.     Consistent with the playbook that has triggered dozens of lawsuits over the last decade, Alliant resolved not to build a yacht practice, but to take one. And it targeted the market leader: MMA. MMA's yacht practice is one of the most sophisticated, well-established, and successful in the country, with deep expertise in hull and machinery coverage, protection and indemnity programs, pollution liability, international navigation risk, Lloyd's marine markets, complex crew structures, the bespoke needs of owners of 50-meter-plus vessels, and, most importantly from Alliant's perspective, defined by decades-deep client relationships across some of the highest-value private vessels in the world. Rather than earn those relationships, Alliant set out to appropriate them.

43.     To launch its new yacht practice, Alliant went straight to the top for one of MMA's most senior yacht leaders. Led by Tyler Banks, Executive Vice President, Alliant Private Client, Alliant identified Johnson—MMA's PCSN Yacht Specialty Manager—as the ideal anchor hire who could instantly supply what Alliant lacked. Johnson had spent more than twenty years in the yacht-insurance industry developing and maintaining long-standing relationships with some of MMA's highest-value yacht clients. She was one of MMA's most senior specialists, entrusted with cultivating and servicing relationships with yacht owners, captains, fleet managers, and family offices across some of the most sophisticated private vessels in the world. And after her promotion in July 2024, her visibility expanded even further: she had access not only to the confidential information associated with the clients she directly managed, but to the full suite of confidential information across the entire PCSN yacht practice, including every client, account, renewal, underwriting file, and confidential document maintained within the practice. Her managerial role

thus gave her insight into all aspects of MMA's PCSN yacht-insurance platform, including clients with whom she had no prior involvement.

44.    Alliant understood that recruiting Johnson offered a direct conduit to MMA's yacht-client relationships and the substantial revenue they generated. By hiring Johnson, Alliant sought to bypass the years of investment required to build a genuine yacht practice and instead acquire—overnight—the client relationships, institutional knowledge, and revenue base that MMA had developed through decades of sustained effort and investment.

45.    Alliant knew full well when it recruited Johnson that she was bound by post-employment restrictive covenants prohibiting her from soliciting MMA clients and employees or servicing MMA accounts after her departure—and that those contracts were governed by New York law and contained mandatory forum selection clauses.

46.    As an initial matter, restrictive covenants like those binding Johnson are standard in the insurance brokerage industry. Insurance brokerage firms routinely require employees to agree to client and employee non-solicitation provisions to protect the goodwill, relationships, and confidential information that define their business. Alliant is no exception. It too requires its own employees—including those it poaches from competitors—to sign employment agreements containing two-year client and employee non-solicitation restrictive covenants. *See, e.g*., Alliant Employment Agreement § 9(e), "Covenants by Employee," "Non-Solicitation," attached hereto as **Exhibit B**.

47.    But Alliant not only knows that these covenants are industry standard; it affirmatively requires candidates to disclose them. As part of its regular recruiting practices, Alliant demands that prospective hires provide copies of any existing restrictive covenant agreements, and its standard employment agreement obligates new employees to represent that

23

they have done so. (*See* Ex. B at § 12). Indeed, in prior litigation, Alliant's corporate representative admitted at a Rule 30(b)(6) deposition that Alliant's "typical protocol" when recruiting from competitors is to "get from the recruit his or her employment agreements or whatever other restrictions might have existed and have those forwarded on to Alliant Legal."[5] Johnson's NSA, for its part, required her to provide a copy of the NSA to any prospective employer "prior to taking a position with such new employer." (Ex. A, § 19).

48.    In this case, Alliant did not need to rely on general industry knowledge or standard recruiting protocols to understand the scope of Johnson's contractual obligations. It had already confronted these exact covenants just months earlier, when it recruited another MMA producer, Johnny Osborne, who was bound by the *same* MMA Non-Solicitation and Confidentiality Agreement as Johnson. MMA sued Alliant and Osborne in the United States District Court for the Southern District of New York, which entered a preliminary injunction enforcing the MMA NSA against Osborne and Alliant, prohibiting Alliant from soliciting or servicing MMA clients in violation of the agreement. Alliant thus knew exactly what Johnson's covenants prohibited when it targeted her months later.

49.    Aware of the covenants, Alliant proceeded anyway—because ignoring contractual restrictions is Alliant's model. As in countless prior raids, Alliant had no intention of competing fairly by respecting the post-employment covenants it knew bound its new recruit. The only way Johnson's hire made business sense for Alliant was if the client relationships she managed for MMA came with her. Alliant's objective was to poach the producer and transfer the clients.

---

[5] *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, Deposition of Peter Arkley, May 13, 2019, at 153:8-16, 156:7-22, attached as Exhibit 32 to the Transmittal Affidavit and Corrected Transmittal Affidavit of Jarrett W. Horowitz in Support of Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. July 21, 2022).

50.    What followed next confirmed exactly that. Alliant shifted from recruiting Johnson to valuing her: not as a prospective employee whose skills it wished to acquire, but as the conduit for the MMA client revenue it aimed to appropriate. On July 8, 2025, Alliant's Director of Business Development, Sarah Tighe, sent Johnson—at Johnson's personal Gmail account—a Zoom invitation titled "Financial Model Follow Up" for a meeting the next day among Tighe, Johnson, and Alliant executive Banks.

51.    The "follow up" label reflects that an initial financial-model discussion had already occurred. Financial-model meetings are not part of any legitimate recruitment process; they are part of Alliant's leveraged-hire strategy, in which Alliant analyzes the volume and revenue of a producer's current book, estimates what portion can be transitioned, and projects the legal and settlement costs Alliant expects to incur in the resulting litigation predictably stemming from Alliant's knowingly wrongful conduct. Courts have found that Alliant uses such models to quantify the revenue controlled by targeted producers and to forecast the settlement and legal expenses it expects to incur when sued for the raid. *Aon Risk Services v. Cusack*, 34 Misc. 3d 1205(A) (Sup. Ct. 2011). Viewed in that context, Alliant's decision to convene a "Financial Model Follow Up" with Johnson—forty-one days before her resignation—reflects Alliant's modeling of the MMA yacht clients Johnson could deliver and planning the transition of those relationships. The July 8 invitation confirms that long before Johnson resigned from MMA, Alliant was already calculating the revenue from Johnson's MMA book and mapping how to convert and monetize those relationships once she arrived.

52.    The July 8 invitation was just the beginning of a coordinated scheme to pull Johnson—and her MMA clients—into Alliant's yacht practice under the cover of secrecy. Thereafter, Alliant continued communicating with Johnson exclusively through her personal

Gmail account and/or her personal phone—while she remained an MMA manager with full visibility into MMA's PCSN yacht practice, client accounts, renewals, and revenue streams. Alliant's deliberate use of off-platform, personal communication channels ensured MMA would not detect that Alliant and Johnson were already coordinating the transfer of MMA's yacht clients, even as Johnson continued to owe MMA ongoing fiduciary duties of loyalty.

53.    Alliant's financial-modeling exercise had another central purpose: to determine whom she would need to deliver it. On information and belief, as part of that process, Alliant asked Johnson to identify the key MMA personnel whose involvement would be essential to transferring the client relationships she planned to move. On information and belief, Johnson identified two: Erica Thompson, a Senior Client Advisor who had been servicing many of Johnson's yacht accounts for nearly a year, and Kunnemann, a Senior Yacht Account Executive in a separate yacht team maintained by MMA Florida—and, at Alliant's request, Johnson furnished Alliant with confidential information about their compensation to facilitate Alliant's recruitment of them.

54.    Thompson and Kunnemann served very different purposes in the scheme. Thompson would serve as the obvious choice for substantive servicing. When Johnson became a manager, many of her accounts had been transitioned to Thompson for daily servicing, with Johnson assuring clients that she would remain involved in the background even though Thompson would handle the day-to-day, routine work. Thompson was the only MMA employee—other than Johnson herself—with the client familiarity and technical expertise necessary to credibly service Johnson's accounts at Alliant. Thompson's servicing of Johnson's book and her unique familiarity with Johnson's clients made her a natural first recruit for the transition Alliant and Johnson were orchestrating.

55.     Alliant moved quickly to act on that information and secure Thompson. On July 29—less than three weeks after the July 9 "Financial Model Follow Up" call—Banks contacted Thompson on LinkedIn to initiate a conversation about joining Alliant to help start a yacht practice. Identifying the precise MMA employee who supported Johnson's book required inside knowledge of PCSN's internal workflows—knowledge that could have come only from Johnson. The timing and targeting of Alliant's recruitment efforts therefore reflect Johnson's direct involvement in selecting the personnel Alliant would need to transition her client relationships.

56.     Unlike Thompson—whose value to the scheme lay in her direct familiarity with Johnson's clients—Kunnemann worked on an entirely separate yacht-insurance team within MMA. MMA maintains two yacht practices with distinct reporting lines: the PCSN yacht practice and the MMA Florida yacht team. The division between the two practices reflects historical organizational lines dating back to their origins. Before becoming part of MMA in 2022, Marsh's Private Client Services ("PCS") group was a national, high-net-worth personal-lines practice serving ultra-high-net-worth individuals across the country. Within that group sat a yacht practice that, by virtue of PCS's exclusive ultra-high-net-worth client base, focused almost entirely on very large, high-value yachts owned by those clients.

57.     By contrast, MMA had long maintained its own private-client practice across its regional operations, including the private-client group within MMA Florida. As part of that structure, MMA Florida developed a yacht-insurance team that reflected MMA's broader private-client mix: a portfolio spanning smaller recreational vessels, mid-sized yachts, and substantial multi-million-dollar vessels.

58.     When Marsh PCS was transferred into MMA effective January 1, 2022, it became Private Client Services National ("PCSN"), effectively the thirteenth "region" of MMA. Although

PCSN now sits within MMA, its yacht practice remained distinct from MMA Florida's yacht team, retaining the ultra-high-net-worth-focused specialization shaped by its Marsh PCS heritage. PCSN thus continues to operate as a more niche, mega-yacht-focused practice, while MMA Florida's yacht team handles a broader range of yacht-insurance accounts across the full spectrum of vessel sizes.

59.    Within that structure, Kunnemann sat on the MMA Florida yacht team, not PCSN, and his day-to-day work centered on the clients assigned to that regional practice. Johnson knew him well. When the PCSN yacht practice was first transferred into MMA, PCSN Yacht Specialty Leader James Bishop assumed managerial oversight of both yacht groups—the PCSN yacht practice he already led and the MMA Florida yacht team. Bishop managed both practices under this unified reporting line until early 2024. During this period of shared oversight, Johnson had come to view Kunnemann as a capable and promising junior colleague. After the teams returned to their separate reporting lines in 2024, Johnson even urged Bishop to consider bringing Kunnemann into the PCSN practice and arranged for him to interview for that role.

60.    But while Kunnemann did not work on Johnson's PCSN clients, that absence of connection was the very feature that gave him value in Alliant's and Johnson's scheme. What Alliant needed—and what Johnson supplied—was a non-restricted MMA employee who could be positioned as the nominal point of contact while Johnson directed the transition from behind the scenes.

61.    Kunnemann's role in the scheme flowed from fact that he had no relationship, responsibility, or history with the PCSN clients Johnson sought to move. He could not draw those clients to Alliant, influence their decision to leave, or independently service the programs Johnson

had built over two decades. What he could do—and what Alliant needed him to do—was provide a face and a name that was not contractually barred from interacting with those clients.

62.     Alliant has a documented history of recruiting non-restricted employees to act as "fronts" or "strawmen" for newly hired producers whose restrictive covenants bar them from soliciting or servicing the clients they intend to move. The restricted producer supplies the relationships, expertise, and direction; the non-restricted recruit supplies the nominal interface. It is an Alliant strategy that courts have recognized—and rejected.

63.     For example, in a June 2025 preliminary-injunction hearing arising from Alliant's raid of Acrisure of California, LLC, a federal judge rejected Alliant's effort to attribute client departures to another former Acrisure employee who had no restrictive covenants and who had joined Alliant at the same time as the restricted producer. *Acrisure of California, LLC v. Bedrosian*, No. 25-cv-00586, ECF No. 79 at 33:9–11 (W.D. Mich. June 16, 2025). When Alliant's regular outside counsel—the same firm representing Alliant and Johnson here—argued that the non-restricted employee alone had solicited the clients and that the restricted producer "had nothing to do with" the client departures (*id.* at 32:20–33:5, 34:6–7), the court responded bluntly: "I'm not buying that. Sorry….There's too much of a coincidence here, Counsel." (*Id*. at 33:6–9). The court found that Alliant's explanation—that a different, non-restricted employee had independently solicited the restricted producer's clients and successfully moved them to Alliant, with the restricted producer supposedly having "nothing to do with" the solicitation and movement of his own clients—defied common sense, repeating "there's too much of a coincidence here, Counsel…Too much of a coincidence." (*Id.* at 33:6–11). The exchange reflects a judicially recognized pattern: Alliant recruits a non-restricted employee as the ostensible face of solicitation while the restricted producer directs the transition from behind the scenes.

64.     Alliant's own internal communications in another recent raid further confirm this pattern. In litigation arising from Alliant's recruitment of an AssuredPartners ("AP") producer, Alan Jones, Alliant paired Jones—a restricted producer whose non-solicitation covenants barred him from moving his book—with another recruit, Josh Tucker, whose restrictive covenants were expiring. Tucker told Alliant's recruiter that, unlike Jones, he could "AOR all of those accounts" when his restrictions expired—explicitly positioning himself as the person who could serve as the nominal broker for Jones's restricted clients.



**Josh Tucker** · November 29, 2023 at 3:48 PM
FYI, Assured Partners is going to announce in the next few weeks that they either sold to AON or flipped to another private equity partner.
Alan can't do anything until that's announced. Also his book is 5.6 million in revenue. With my non-compete coming up I could AOR all of those accounts.
Those were his words not mine.

*Jones v. AssuredPartners NL, LLC*, No. 3:24-cv-00398-DJH-CHL, ECF No. 165-1 at GTStaffing000284, (W.D. Ky. Jan. 29, 2025). Alliant embraced exactly that role for Tucker. In text messages produced in that case, Alliant Executive Vice President and Managing Director Todd Yomtov wrote to the recruiter regarding Tucker's acceptance of his offer: *"I don't want him [Tucker] without the other one [Jones]. Ahhhhhhh."* (*Id.* at ECF No. 149-2 at p. 6).



This exchange reflects Alliant's established strategy: hire a non-restricted former coworker to act as the face of solicitation, allow the restricted producer to direct the transition from behind the scenes, and use the non-restricted employee as a buffer against proof of restrictive-covenant violations.

65.    On information and belief, that is precisely the role Alliant and Johnson envisioned for Kunnemann: he would be positioned as the servicing broker—the nominal point of contact, lacking any prior connection to Johnson's PCSN clients and therefore not restricted from soliciting or servicing them under his MMA agreement—while Johnson orchestrated the solicitation and servicing behind the scenes.

**H.      Johnson Resigns from MMA, Joins Alliant, and She and Alliant Continue
Their Scheme**

66.      On August 19, 2025, Johnson informed her manager, Yacht Specialty Leader James
Bishop, that she was resigning to join Alliant, explaining that Alliant had offered her "life-
changing money" to join. She did not disclose that for weeks Alliant had been modeling the
revenue her MMA client relationships could generate—and had already begun recruiting the team
member who serviced her accounts and an additional MMA employee she had singled out as useful
to the transition. Accounting for vacation time, Johnson's effective final day of employment was
August 27, 2025.

67.      On information and belief, Johnson commenced employment at Alliant
immediately after the effective date of her resignation from MMA. Alliant installed her as the
Yacht Practice Leader within Alliant Private Client—the executive responsible for launching the
yacht practice Alliant had decided to create in 2025.

68.      At the time Johnson joined, the "practice" consisted only of Johnson herself. While
Johnson and Alliant had planned for her to be joined shortly by Thompson—the only MMA
employee who both knew Johnson's clients and had the technical expertise to service their large,
complex yacht programs, thus making her Johnson's ideal service partner—that plan quickly
unraveled.

69.      Thompson and Banks spoke on August 27, the effective date of Johnson's
resignation. Banks explained that Alliant was developing a personal-lines yacht practice and was
seeking strong people to help build it. From that conversation, Thompson understood that Alliant
had an existing commercial-marine department but no personal-lines yacht practice—and that
Alliant was attempting to create one from scratch. Having previously worked at an agency that

had attempted to build a yacht practice and not wishing to join another start-up effort, Thompson declined to pursue the opportunity.

70.    Although Thompson declined to join Alliant, Kunnemann did. On September 11, 2025, hardly two weeks after Johnson's last day, Kunnemann informed his manager at MMA, Richard Combs, that he was resigning effective September 25. He disclosed that he was going to Alliant to build out a new yacht practice. Like Johnson, he explained that he had been offered a substantial compensation increase to incentivize him to join.

71.    Although Alliant claimed in subsequent correspondence with MMA that it had previously communicated with Kunnemann about potential employment, any suggestion that Johnson played no role in Alliant's recruitment of Kunnemann is implausible.  At the time, Kunnemann had approximately seven years of yacht-insurance experience—all of it acquired at MMA and all of it under the supervision and guidance of more senior specialists and producers. A broker with only seven years in the industry would not realistically be tapped to create a yacht practice with no infrastructure or no leader until Johnson agreed to take the role. Any purported discussions with him before Johnson committed to lead the practice could not have been meaningful because there was no practice for him to join. And the timing confirms as much: he resigned only after Johnson resigned, and he joined Alliant only after Johnson had assumed leadership of the newly created yacht practice.

72.    Moreover, Alliant hired Johnson to *create* and *lead* Alliant's new yacht practice, which at the time consisted solely of Johnson herself. No newly hired practice leader—particularly one responsible for founding an entirely new specialty practice of one—would reasonably expect

33

Alliant to unilaterally select junior personnel for her practice, let alone the *only* other member of her team, without her input.

73.    Of all the employees at MMA or even within its two yacht practices, Alliant targeted the two individuals most closely tied to Johnson: Thompson, who handled many of Johnson's client accounts, and Kunnemann, the more junior employee Johnson had personally tried to recruit into her PCSN team. The identity of those individuals could only have come from Johnson. Their selection reflects Johnson's role in shaping the team Alliant would need to carry out the client transition she and Alliant had planned.

74.    The subsequent events only reinforce that fact. When Kunnemann returned his MMA-issued cell phone in connection with his departure, he had restored the device to its factory settings before surrendering it—thereby wiping all text messages, call logs, and other data from the period immediately preceding his resignation. That action ensured that any communications reflecting his coordination with Johnson or Alliant, including messages sent or received while he remained employed by MMA, would be irretrievably deleted. The timing and manner of the wipe permit a reasonable inference that Kunnemann erased the device to prevent MMA from discovering incriminating communications concerning his recruitment by Alliant and Johnson and his role in their coordinated plan.

75.    With Johnson and Kunnemann in place, Alliant publicly promoted that it could "handle the biggest yachts now," signaling that Johnson's hire—and the nominal addition of Kunnemann—gave Alliant capabilities it plainly lacked before. Alliant began showcasing its

newly formed yacht practice immediately and moved without delay to position Johnson and Kunnemann to pursue MMA's yacht clients.

76.     On October 9, 2025—barely two weeks after Kunnemann joined Alliant—Johnson, using her Alliant email address, forwarded to him a scanned yacht-insurance application for a current MMA client with which she had been involved during her time at MMA. The document Johnson sent contained detailed, nonpublic underwriting information that MMA had compiled and maintained in its confidential client files, including the vessel's insured value, navigation itinerary, operational plans, crew structure, recent survey information, prior losses, mooring locations, upcoming maintenance ("yard") periods, and coverage needs. The version Johnson transmitted matched the version contained in MMA's files—down to its formatting, spacing, and date—and bore handwritten markings and highlights, indicating that Johnson had retained a printed copy of MMA's confidential document and removed it from MMA before her departure.

77.     There was no legitimate reason for Johnson, now an Alliant employee, to possess or transmit MMA's confidential underwriting application for an active MMA client—let alone to send it to Kunnemann at his new employer. The only reasonable inference is that Johnson forwarded the application to enable Alliant's new yacht practice—consisting solely of Johnson and Kunnemann—to pursue the client, using MMA's confidential client information to accomplish the solicitation and service the account. The October 9 transmission confirmed that Johnson, armed with MMA's confidential client materials and relationships, would direct the transition of MMA's high-value yacht accounts, while Kunnemann served as the nominal point of contact.

78.     The circumstances of Johnson's transmission further underscore the deliberate and concealed nature of her misconduct. Johnson did not email the underwriting application to her personal email account while employed at MMA, which would have created an electronic trail that

35

MMA could have traced. Instead, she retained a hard-copy version of the confidential document—ensuring that her removal of MMA's client information would go undetected—and only revealed its existence inadvertently when she mistakenly addressed the October 9 email to Kunnemann's former MMA email account. That accidental misdirection is the only reason MMA learned of the document's removal at all. The fact that Johnson preserved this client's underwriting file in hard-copy form and attempted to transmit it through Alliant channels without detection permits a reasonable inference that this was not an isolated act; rather, MMA likely has uncovered only a fraction of the confidential materials that Johnson removed and retained. And the events that followed confirmed exactly that.

79.    The weeks that followed confirmed that Johnson's covert removal of MMA's confidential yacht-insurance materials was part of a broader plan to divert her former yacht clients from MMA. First, the captain of a long-standing MMA mega-yacht client with whom Johnson had worked for years contacted MMA to say that the client "known and used Katie Johnson for a long time" and that the client wished to "continue using her for all of [his]…yachts," and requested that she be released from the contractual restrictions he understood she had prohibiting exactly that. The captain did not express any interest in Alliant, nor did he identify any dissatisfaction with MMA; the request focused solely on Johnson personally. MMA responded that Johnson remained subject to contractual non-solicitation and non-servicing obligations and could not be released from them. The captain's communication—arriving just weeks after Johnson joined Alliant—reflected Johnson's continuing influence over the client relationship. On information and belief, the captain's request that Johnson be "released" from her restrictions was a ploy engineered by Alliant and Johnson—prompted and scripted by them—as part of their effort to transition the client

to Alliant, to fabricate the appearance that the client, rather than Johnson, had initiated the contact and to use that appearance as a pretext to advance Alliant's effort to take the account.

80.     Concerned that Johnson was soliciting this client and others, MMA wrote to Johnson on October 23, 2025, expressly advising that it had reason to believe she was violating her restrictive covenants and demanding that she cease and desist. On October 30, Alliant's counsel responded with categorical denials, asserting that Johnson "has not contacted, solicited, or serviced any MMA clients." Those denials were inconsistent with the facts then known to MMA—including the captain's communication indicating that the client wished to "continue working with Katie Johnson" despite her restrictive covenants—and have since been further undermined by evidence MMA later uncovered, including her October 9 transmission of MMA's confidential underwriting materials to Kunnemann at Alliant.

81.     Despite MMA's October 23 warning and Alliant's October 30 denials, Johnson's efforts to divert MMA's yacht clients continued unabated. On November 3, 2025, a long-standing MMA yacht client for whom Johnson had served as the primary broker for years—issued a broker-of-record letter appointing Alliant as its new broker. The timing of this BOR—coming within weeks of Johnson arrival at Alliant and involving a client whose relationship Johnson had cultivated and maintained during her tenure at MMA—confirmed that Alliant's and Johnson's assurances of compliance were not credible and Johnson was using her influence and insider knowledge to divert MMA yacht clients to Alliant—the very risk MMA's covenants were designed to prevent.

82.     Worse, on November 11, MMA received carrier notices that two additional yacht accounts—both belonging to the same ultra-high-net-worth MMA client whose captain had contacted MMA in October to say that the client "wished to continue working with Katie

[Johnson]" despite her restrictions—had submitted broker-of-record letters naming Alliant as their broker. These vessels are mega-yachts of extraordinary size, complexity, and value—among the largest and most technically complex and sophisticated private vessels in the global market. Their BORs, received on the morning of November 11, made clear that Johnson's influence over the client relationship continued unabated and that Johnson had continued her efforts to divert this client to Alliant despite MMA's warning.

83.    Later that same day, MMA wrote to Alliant's and Johnson's counsel, raising the newly issued BORs and reiterating that Johnson remained subject to her non-solicitation and non-servicing obligations.

84.    On November 14, Alliant's counsel responded with sweeping denials, asserting that Johnson had "not solicited and is not servicing" her former MMA clients and claiming that Alliant's "Marine Practice" had long brokered "high-end yachts." Any suggestion that Alliant's Marine Practice solicited or is servicing Johnson's MMA yacht clients is untenable. Alliant's Marine Practice handles commercial maritime risks—ports, terminals, cargo, shipyards, energy infrastructure, and commercial vessels bearing no resemblance to private mega-yachts. Mega-yachts require specialized underwriting, navigation oversight, crew-management guidance, and risk-management support that commercial-marine teams do not provide. The vessels at issue here are owned by an ultra-high-net-worth client and represent some of the most technically demanding yacht-insurance risks in the world. There is no plausible scenario in which such a client would elect to have its complex programs serviced by a commercial-marine unit with no mega-yacht expertise.

85.    Nor could these mega-yacht accounts realistically be serviced by Kunnemann. This client had been working with Johnson for many years and relied on the deep relationship, account

history, and trust she had built across repeated renewals and complex placements. By contrast, Kunnemann was a complete stranger to this client—he had no involvement with either vessel, no knowledge of the account's history, no relationship with the owner, captain, or family office, and only seven years of total yacht-insurance experience. For a client with two large private yachts, there is no plausible scenario in which such a client would entrust its yacht program to a broker it had never met, with no familiarity with its risk profile, no understanding of its coverage history, and no prior involvement in the account—unless Johnson were orchestrating and directing the service behind the scenes.

86.     There is no plausible explanation for why these clients, all of whom had entrusted Johnson with their vessels, crew, and insurance needs for years, would suddenly and coincidentally move their business to Alliant—an entity with no established yacht practice—at the precise moment Johnson arrived there, unless Johnson was involved in steering them to Alliant and is now servicing their accounts there.

87.     The only plausible explanation is the obvious one: the client moved to Alliant to continue working with Johnson, exactly as the captain's October communication had foreshadowed. Johnson is the only person at Alliant with the knowledge, history, and expertise necessary to service these yacht accounts, and she is the only person with whom the client sought to work. Alliant's suggestion that a commercial-marine team—or a junior recreational-vessel broker—is now servicing some of the most complex private-yacht risks in the world defies common sense. The identity of the clients, the timing of the BORs, Johnson's central role in Alliant's fledgling yacht-practice, and the absence of any other qualified personnel at Alliant all

point to a single conclusion: Johnson solicited these clients and is now servicing them at Alliant in direct violation of her contractual obligations.

88.    The October 9 transmission of MMA's confidential underwriting application for another active MMA yacht client further confirms that Johnson's misconduct is not confined to the clients who have already submitted BORs. That client remains with MMA today, but Johnson's retention of a printed copy of that application—and her decision to forward it to Kunnemann at Alliant—demonstrate that she removed confidential MMA documents in anticipation of pursuing additional restricted accounts. MMA cannot know what other confidential materials Johnson retained or to what extent she and Alliant have already used them, but the October 9 transmission makes clear that the November BORs are not isolated events: Johnson is actively working to position Alliant to solicit and convert the full suite of MMA yacht clients she serviced, oversaw, or had visibility into during her decades at MMA. Her actions show that she is not done.

### COUNT I
**Breach of the Non-Solicitation and Confidentiality Agreement –**
**Client Non-Solicitation and Non-Servicing**
**(Against Johnson)**

89.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 88 above.

90.    Johnson voluntarily executed the NSA with MMA.

91.    The NSA is a valid and binding contract, in consideration for which Johnson received good and valuable consideration, including a cash bonus and employment with MMA.

92.    Johnson breached the terms of the NSA by, among other things, directly and/or indirectly:

    a.    soliciting clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Johnson while employed by MMA;

b.    inducing clients and/or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA;

c.    performing or supervising the performance of services or the provision of products, of the type sold or provided by Johnson while she was employed by MMA, on behalf of clients and/or prospective clients of MMA; and/or

d.    assisting others to the acts specified above.

93.    MMA fully performed its obligations under the NSA.

94.    As a direct and proximate result of Johnson's breaches of the NSA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Johnson is restrained from her current conduct and compelled to abide by the terms of the NSA.

95.    As a direct and proximate result of Johnson's breaches of the NSA, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT II
**Breach of the Non-Solicitation and Confidentiality Agreement –
Non-Solicitation of Employees
(Against Johnson)**

96.     MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 95 above.

97.     Johnson voluntarily executed the NSA with MMA.

98.     The NSA is a valid and binding contract, in consideration for which Johnson received good and valuable consideration, including a cash bonus and employment with MMA.

99.     Johnson breached the terms of the NSA by, among other things, directly or indirectly, soliciting or otherwise endeavoring to cause employees of MMA with whom Johnson, during her final two years at MMA, had come into contact for the purpose of soliciting or servicing business or about whom Johnson had obtained Confidential Information and Trade Secrets (as defined in the NSA) to leave employment with MMA.

100.    Specifically, Johnson breached the NSA by, directly or indirectly, soliciting or otherwise endeavoring to cause at least Thompson and Kunnemann to leave employment with MMA. During her last two years of employment at MMA, Johnson repeatedly came into contact with Thompson and Kunnemann for the purpose of soliciting or servicing business, and also repeatedly obtained confidential information about them.

101.    MMA fully performed its obligations under the NSA.

102.    As a direct and proximate result of Johnson's breaches of the NSA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Johnson is restrained from her current conduct and compelled to abide by the terms of the NSA.

103.    As a direct and proximate result of Johnson's breaches of the NSA, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT III
### Breach of the Non-Solicitation and Confidentiality Agreement – Confidentiality
### (Against Johnson)

104.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 103 above.

105.    Johnson voluntarily executed the NSA with MMA.

106.    The NSA is a valid and binding contract, in consideration for which Johnson received good and valuable consideration, including a cash bonus and employment with MMA.

107.    By committing the above-described acts, Johnson violated the NSA, including by violating her confidentiality covenant by using and disclosing MMA's confidential information to and for the benefit of a third party.

108.    MMA has performed all of its obligations under the NSA.

109.    As a direct and proximate result of Johnson's breaches of the NSA, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Johnson is restrained from her current conduct and compelled to abide by the terms of her NSA.

110.    As a direct and proximate result of Johnson's breaches of the NSA, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently

ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

<u>COUNT IV</u>
**Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Johnson and Alliant)**

111.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 110 above.

112.    Johnson and Alliant violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (the "DTSA") by misappropriating trade secrets from MMA for services used in, or intended for use in, interstate or foreign commerce.

113.    Johnson and Alliant possess MMA's trade secrets under the DTSA in the form of, at a minimum, the confidential yacht-insurance underwriting materials that Johnson removed from MMA and transmitted to Alliant, including detailed, nonpublic information concerning a current MMA yacht client's vessel values, navigation plans and itineraries, operational and maintenance history, crew structure, prior losses, survey reports, mooring locations, upcoming yard periods, classification and registration details, towing plans, and coverage specifications. This information reflects MMA's proprietary assessment of the client's risk profile, underwriting needs, and insurance program design, and derives independent economic value from not being generally known or readily ascertainable by competitors.

114.    MMA's confidential and trade secret information relates to services used in, or intended to be used in, conducting business throughout the United States.

115.    Upon information and belief, Johnson and Alliant are using and will continue to use MMA's trade secrets to conduct business.

44

116.    MMA invested substantial time and resources to generate such information that Johnson misappropriated in concert with Alliant. The information contained in the misappropriated materials derives independent economic value by virtue of not being known or available to the public.  MMA has kept this information sufficiently secret to give it a competitive advantage.  It has taken affirmative measures to prevent others from acquiring it or using it by means including, but not limited to, requiring those who have access to it (including Johnson) to sign agreements restricting their use of MMA's confidential information. Access to MMA's systems, including employee computers, phones and other devices, is password protected.

117.    MMA communicated its trade secrets to Johnson in confidence and she knew that MMA intended its trade secrets to remain confidential. As such, Johnson promised to keep MMA's trade secrets confidential, to use MMA's trade secrets only on behalf of MMA, and to return and discontinue use of MMA's trade secrets when her employment with MMA ended.

118.    At Alliant's direction and for its benefit, Johnson misappropriated MMA's trade secrets by improper acquisition, unauthorized disclosure, or unauthorized use.

119.    Due to her position working for a direct competitor of MMA, and her possession of MMA's trade secrets and confidential and proprietary information, there is a substantial likelihood that Johnson has disclosed or used, and will continue to use, MMA's trade secrets.

120.    As a direct and proximate result of Johnson's unlawful conduct, MMA has been irreparably damaged, and Johnson and Alliant have been unjustly enriched. This unjust enrichment includes value attributable to the misappropriated information, amounts that Johnson and Alliant saved in costs and development by using the misappropriated information, and increased productivity resulting from the use of the misappropriated information and increased market share.

The exact amount of these damages and unjust enrichment is not presently ascertainable but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

121.    The acts described above constituted willful and malicious misappropriation in that Johnson, at Alliant's direction, stole an alarming amount of proprietary information and did so with the deliberate intent to injure MMA's business and improve her and Alliant's own. Accordingly, MMA is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1836 and exemplary damages under 18 U.S.C. § 1836.

122.    As a direct and proximate result of Johnson's conduct, at Alliant's direction, and continued use of MMA's misappropriated trade secrets, MMA has suffered and will continue to suffer extensive injury and harm to its business.

123.    As a direct and proximate result of Johnson's conduct, at Alliant's direction, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

**COUNT V**
**Breach of Duty of Loyalty**
**(Against Johnson)**

124.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 123 above.

125.    By virtue of Johnson's position at MMA, the special relationship of trust and confidence reposed by MMA in her, and the permission afforded her by MMA to its confidential, proprietary and trade secret information, Johnson was required to act solely in MMA's interest. Johnson also had duties of loyalty and utmost good faith to MMA and was obligated not to compete with MMA while employed by MMA.

126.    Johnson breached her duty of loyalty owed to MMA by, among other things:

        a.    concealing from MMA that she had accepted an offer to join Alliant and deceiving MMA into believing that it had her undivided loyalty, including deceiving MMA into permitting her to continue to have access to its clients, employees, and confidential and proprietary information;

        b.    while still employed by MMA, retaining, accessing, misappropriating and disclosing MMA's confidential and proprietary information—including confidential information concerning MMA's employees and client accounts—to Alliant to facilitate Alliant's recruitment efforts and to enable Alliant to prepare to solicit and service MMA clients;

        c.    while still employed by MMA, assisting Alliant in identifying MMA personnel for recruitment, including providing Alliant with confidential information about MMA employees to aid in Alliant's recruitment of them; and

        d.    otherwise acting in Alliant's interests, and not MMA's, by taking steps during her MMA employment to advance Alliant's creation of a competing yacht practice and to position Alliant to divert MMA's yacht clients and employees immediately following her departure.

127.    As a direct and proximate result of Johnson's breaches of her duty of loyalty, MMA has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

128.    As a direct and proximate result of Johnson's breach of her duty of loyalty, MMA already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to attorneys' fees and costs related to this litigation, as well as lost business, in an amount to be proven at trial.

129.    Johnson committed these acts knowingly, willfully and in conscious disregard of MMA's rights. Accordingly, MMA is entitled to recover actual and exemplary damages in an amount to be proven at trial.

**COUNT VI**
**Aiding and Abetting Breach of Duty of Loyalty**
**(Against Alliant)**

130.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 129 above.

131.    Johnson owed a duty of loyalty to MMA during her employment with MMA.

132.    Johnson's duty of loyalty prohibited her from, among other things, competing with MMA by soliciting MMA clients and employees away to do business with a competitor.

133.    Johnson violated her duty of loyalty by soliciting MMA's clients away from MMA to do business with Alliant while Johnson was still employed with MMA.

134.    Johnson violated her fiduciary duty of loyalty by soliciting MMA's employees away from MMA to join Alliant while Johnson was still employed with MMA.

135.    Alliant knowingly participated in Johnson's breaches of her duty of loyalty by encouraging and substantially assisting Johnson's breaches of her duty of loyalty.

136.    As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

137.    As a direct and proximate result of Alliant's wrongful conduct, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT VII
### Tortious Interference with Contract
### (Against Alliant)

138.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 137 above.

139.    Alliant was aware of the contractual relationship between Johnson and MMA, including her contractual obligations to MMA refrain from soliciting or servicing MMA clients and from soliciting employees.

140.    Alliant, improperly and without privilege, interfered in MMA's contracts with Johnson by inducing, enticing and directing her to breach her contractual obligations to MMA, including, without limitation, by encouraging and assisting her in the solicitation of MMA's clients to move their business to Alliant, the servicing of MMA clients at Alliant, and the solicitation of MMA employees to leave their employment at MMA and join Alliant.

141.    As alleged above, Johnson, at Alliant's inducement and direction, violated the NSA by, without limitation, violating her client non-solicitation covenants by soliciting MMA clients to move their business from MMA to Alliant and servicing MMA clients at Alliant. Alliant was aware of Johnson's contractual obligations but directed her to violate them for Alliant's benefit.

142.    As alleged above, Johnson, at Alliant's inducement and direction, violated the NSA by, without limitation, violating her employee non-solicitation covenants by soliciting MMA

employees to leave their employment at MMA and join Alliant. Alliant was aware of Johnson's contractual obligations but directed her to violate them for Alliant's benefit.

143.    The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to MMA with respect to its relationships with its clients.

144.    As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

145.    As a direct and proximate result of Alliant's wrongful conduct, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

<u>COUNT VIII</u>
**Tortious Interference with Business Relations**
**(Against Alliant and Johnson)**

146.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 145 above.

147.    MMA had ongoing relationships with its clients.

148.    As a Yacht Specialty Manager at MMA, Johnson had influential relationships with MMA clients, which were developed and strengthened over the years by virtue of her access to and knowledge of MMA's confidential and trade secret information, which Johnson used to form successful relationships with MMA's clients.

149.    Johnson and Alliant have knowledge about MMA's relationships with its clients. Indeed, Johnson and Alliant had knowledge of MMA's relationships with the clients for which Johnson was responsible at MMA, which Johnson, at Alliant's direction and with its assistance and encouragement, improperly solicited away from MMA.

150.    Despite this knowledge, Johnson and Alliant have intentionally and improperly interfered with the relationships between MMA and its clients by soliciting MMA's clients to cease their business with MMA and move their business to Alliant.

151.    Johnson and Alliant engaged in wrongful conduct in doing so, by (among other things) Johnson breaching her contractual and common law duties to MMA, with Alliant's knowledge, assistance, and encouragement. Johnson and Alliant further accomplished their wrongful solicitation of the MMA clients for which Johnson had been responsible at MMA by misappropriating confidential and proprietary information from MMA and using that information to solicit MMA's clients. On information and belief, they further accomplished their wrongful solicitation of the MMA clients for which Johnson had been responsible at MMA by assuring the clients that Johnson would, directly or indirectly, service their accounts, despite Johnson's and Alliant's knowledge that Johnson was prohibited from doing so per her contract with MMA.

152.    Johnson's and Alliant's conduct extends beyond the boundaries fair competition and has been tortious, in bad faith, dishonest, and designed to harm MMA.

153.    Johnson and Alliant were aware that this conduct would disrupt MMA's business relationships and intended this disruption to occur for the benefit of themselves.

154.    As a direct and proximate result of Johnson's and Alliant's conduct, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## JURY TRIAL DEMAND

MMA hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil

Procedure as to all issues or claims for which a jury trial is allowed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MMA respectfully requests that the Court:

A. Enter preliminary and permanent injunctive relief enjoining Johnson from committing other acts in violation of the NSA, and further extending the length of Johnson's restrictions under the NSA by a period equal to the length of time from the date of Johnson's first breaches of the NSA until the date of this Court's order;

B. Enter judgment awarding MMA direct and consequential damages in an amount to be determined at trial, to compensate MMA for the losses it suffered by reason of Johnson's breaches of her duty of loyalty (and Alliant's aiding and abetting of those breaches), Johnson's breaches of her contractual obligations to MMA (and Alliant's inducement of those breaches), Alliant's interference in MMA's contractual relationships with Johnson, and Alliant's and Johnson's wrongful interference with MMA's business relations with clients;

C. Enter judgment awarding MMA any compensation amounts paid to Johnson during the period of her disloyalty;

D. Enter judgment awarding MMA punitive damages for Defendants' intentional misconduct and/or gross negligence;

E. Enter judgment awarding MMA its reasonable costs and attorneys' fees incurred by MMA in connection with the litigation, as expressly provided under the NSA, as well as under the DTSA;

F. Awarding punitive damages; and

G. Grant MMA such other and further relief as the Court deems just and proper.

Dated:  November 25, 2025
        New York, New York

                            EPSTEIN, BECKER & GREEN, P.C.


                            By:    _*/s/ David W. Garland*_____
                                   DAVID W. GARLAND
                                   A.  MILLIE WARNER

                            875 Third Avenue
                            New York, New York 10022
                            (212) 351-4500
                            *Attorneys for Plaintiff*
                            *Marsh & McLennan Agency LLC*